**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM HANNAH, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-cv-7564 |
| v. | ) ) | Hon. Steven C. Seeger |
| THE HUNTINGTON NATIONAL BANK, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Hannah worked long hours as a Mortgage Loan Officer for Defendant The Huntington National Bank in a Chicago suburb. He claims that he was entitled to overtime pay, but Huntington didn't pay him what he earned. He now sues for overtime pay under the Fair Labor Standards Act.

Hannah puts the blame squarely on the shoulders of his former supervisor. She allegedly squelched his overtime requests. Sometimes she entered his timesheets without his permission, showing no overtime. When he attempted to submit overtime requests, she rejected them, forcing him to submit new timesheets with no overtime. In his declaration, he repeatedly pins the blame on her for preventing him from receiving the pay that he deserved.

Hannah doesn't simply bring claims in an individual capacity. He also seeks to bring a collective action on behalf of all Mortgage Loan Officers nationwide, alleging that Huntington had a policy or practice of refusing to pay overtime. Based on his personal experience in the Chicagoland area, he wants all loan officers in the country to receive a notice about the possibility of opting in to this case.

Huntington opposes the motion, and filed a motion of its own.  Huntington moved to dismiss any claims by any opt-in plaintiffs who worked outside Illinois.  The bank argues that this Court lacks personal jurisdiction over claims by non-Illinois plaintiffs about conduct that took place outside Illinois.

This Court grants in part and denies in part Hannah's motion to proceed as a collective action.  The Court grants the motion to the extent that Hannah seeks to proceed as a collective action with respect to Mortgage Loan Officers who worked for his supervisor at the Huntington branch in Downers Grove, Illinois.  The Court denies the motion with respect to employees working anywhere else, including any other state and any other branch office in Illinois.  Because there are no opt-in plaintiffs from outside Illinois, this Court denies the motion to dismiss as moot.

## Background

William Hannah worked for Huntington National Bank as a Mortgage Loan Officer from May 2017 to October 2018.[1]  *See* Cplt. ¶ 5; Hannah Decl., at ¶ 3 (Dckt. No. 29-3).  Huntington is based in Columbus, Ohio, and it offers mortgage loans to customers across the country.  *See* Hannah Decl., at ¶¶ 7, 9, 10.  According to Huntington, it had Mortgage Loan Officers in 12 states during the period in question:  Illinois, Florida, Indiana, Kentucky, Maryland, Michigan,

---

[1] Plaintiff originally sued "Huntington Bancshares, Inc. d/b/a The Huntington National Bank."  In each of its summary judgment filings, Defendant noted that The Huntington National Bank is a wholly-owned subsidiary of Huntington Bancshares, Incorporated, and thus is a legal entity in its own right.  *See* Def.'s Mem. of Law in Supp. of Mot. to Dismiss, at 1 n.1 (Dckt. No. 22); Def.'s Resp. to Pl.'s Mot. for Cert., at 1 n.1 (Dckt. No. 44).  Defendant pointed to its corporate disclosure statement.  *See* Dckt. No. 9.  The Court then issued an Order to show cause why Huntington Bancshares, Inc. should not be dismissed and why The Huntington National Bank should not be the sole Defendant.  *See* 5/15/20 Order (Dckt. No. 72).  After all, Plaintiff worked for The Huntington National Bank (the subsidiary), not Huntington Bancshares, Inc. (the parent), and it is not accurate to say that the subsidiary "does business as" the parent.  The parties agreed (Dckt. No. 73), so this Court entered an Order dismissing Huntington Bancshares, Inc.  *See* 5/19/20 (Dckt. No. 74).

Missouri, New Jersey, Ohio, Pennsylvania, Wisconsin, and West Virginia. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 1 (Dckt. No. 44); Marek Decl., at ¶ 24 (Dckt. No. 22-1); *see also* Cplt. ¶ 7.

But Hannah worked exclusively in the Chicagoland area. He primarily worked at Huntington's office in Downers Grove, and he occasionally worked at another branch in the suburbs or at a corporate office in downtown Chicago. *See* Hannah Decl., at ¶ 3 (Dckt. No. 29-3). He sometimes worked from home, too. *Id.*

As the title suggests, Hannah's role as a Mortgage Loan Officer was to "sell and process home loans" for Huntington. *See* Cplt. ¶ 10. His "primary duties consisted of calling leads, communicating with potential customers by phone and email, qualifying customers by analyzing their credit situations, and persuading them to originate home mortgages with Huntington." *See* Hannah Decl., at ¶ 9 (Dckt. No. 29-3).

The production goals came from the top. Huntington's corporate office set a "minimum monthly production quota" for Mortgage Loan Officers. *Id.* at ¶ 16. Huntington expected each Mortgage Loan Officer in Hannah's region to close $500,000 in loans per month, or three loan units per month. *Id.* But the goals varied by region, area, team, and individual. *See* Def.'s Mem. of Law in Supp. of Mot. to Dismiss, at 5 (Dckt. No. 22) (citing Marek Decl., at ¶ 33 (Dckt. No. 22-1)).

Huntington used a carrot-and-stick approach to incentivize Mortgage Loan Officers to originate loans. On the positive side, Huntington compensated Mortgage Loan Officers through commissions on successfully closed and funded loans, above and beyond a base salary. *See* Hannah Decl., at ¶ 8 (Dckt. No. 29-3). Hannah's base salary (about $30,000) was a "draw" against his earned commission, which depended on the amount of loans that he closed. *Id.* But on the flipside, it was risky for a Mortgage Loan Officer to fall short. Employees who "did not

3

meet their production goals were subject to discipline, up to and including termination." *Id.* at ¶ 17.

Hannah did a flurry of tasks to meet his monthly goals. He "contacted prospective customers, finalized loans, offered customers other loan products, collected loan documentation, attending closings, marketed Huntington to realtors, etc." *Id.* at ¶ 13. Hannah was not alone – all Mortgage Loan Officers "had similar duties" and were "subject to similar policies and practices." *Id.* at ¶ 14.

Those responsibilities took time. Hannah "regularly worked in excess of 40 hours" in a given work week. *See* Cplt. ¶ 13; *see also* Hannah Decl., at ¶ 18 (Dckt. No. 29-3) ("To meet my production goals, I typically worked 50-70 hours or more each workweek throughout my employment with Huntington."). His managers created a hard-charging environment. They "consistently instructed me and other MLOs to do whatever was necessary to close and fund loans and encouraged us to work long hours." *See* Hannah Decl., at ¶ 15.

Hannah reported to Anna Marek, his Area Manager, for the last six months of his tenure at Huntington. *Id.* at ¶ 4; *see also* Hannah Dep., at 44:10-22, 48:7 – 49:2 (Dckt. No. 44-2); Marek Decl., at ¶ 5 (Dckt. No. 22-1) (stating that she supervised Hannah from April 2018 to October 2018). Marek managed only part of Huntington's Mortgage Retail Division in the Chicago area, called Area South. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 2 (Dckt. No. 44); Marek Decl., at ¶ 4 (Dckt. No. 22-1). Marek managed only 19 Mortgage Loan Officers during the putative collective action period. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 2 (Dckt. No. 44). Marek, in turn, reported to a Regional Sales Manager, Adam Gunn, who oversaw Mortgage Loan

Officers in Ohio, Kentucky, Indiana, Wisconsin, and Illinois.  *See* Hannah Decl., at ¶ 5 (Dckt. No. 29-3).[2]

Huntington had systems in place for employees to keep track of their time.  The Mortgage Loan Officers clocked in and clocked out using a system called "eTime."  *Id.* at ¶ 19. The Area Managers reviewed the time records of the Mortgage Loan Officers in their Area.  *See* Marek Decl., at ¶ 18 (Dckt. No. 22-1).  But according to Hannah, Huntington "failed to make or maintain true and accurate records of all time worked by Plaintiff."  *See* Cplt. ¶ 15.

Hannah contends that his manager discouraged him – and, at times, actively prevented him – from recording his overtime hours on his timesheet.  *See* Hannah Decl., at ¶¶ 20–22 (Dckt. No. 29-3).  As a result, Huntington "did not pay Plaintiff time-and-a-half" for the time that he worked over 40 hours.  *See* Cplt. ¶ 18.  In fact, Huntington did not pay him "*at all* for time worked in excess of 40 hours in given workweeks."  *Id.* at ¶ 19 (emphasis added).

Hannah points fingers squarely at his supervisor.  He contends that "Anna Marek [again, his manager] and Adam Gunn [her supervisor] instructed me and other MLOs to not record more than 40 hours of work in any given workweek, regardless of how much time we actually worked."  *Id.* at ¶ 20; *see also* Cplt. ¶ 16.  But the instruction was more than idle words.  Marek sometimes took things into her own hands, literally.

Marek would "routinely enter and submit time entries on behalf of me and other MLOs which showed that we worked exactly 40 hours in any given workweek."  *See* Hannah Decl., at

---

[2] To complete the chain of command:  Gunn reported to Dan Shanahan (the Mortgage Retail Division Manager), who reported to Jay Plum (the Consumer and Mortgage Lending Director at Huntington's Columbus, Ohio headquarters) who reported to Stephen Steinour, Huntington's CEO.  *See* Hannah Decl., at ¶¶ 6–7 (Dckt. No. 29-3); Pl.'s Mot. for Cert., at 3 (Dckt. No. 29) (citing Marek Dep., at 25:1-3 (Dckt. No. 29-2)).  Hannah does not allege that he had any interaction with Shanahan, Plum, or Steinour with respect to his time records.  He also does not offer any evidence that they played any role in underpaying him.

¶ 21 (Dckt. No. 29-3). "Marek regularly submitted my timecards for me without contacting me first." *Id.* at ¶ 22. She even completed his timecards early, and thus took away his opportunity to submit for overtime. "I sometimes went into the office 1-2 days before my timecard was due so I could be sure to enter my time worked, only to find that Anna Marek had already filled the timecard for me and that my time was already approved." *Id.*

When he attempted to submit for overtime, Marek interfered. "If I attempted to submit time entries that accurately reported my hours worked in excess of 80 hours in a pay period, Anna [Marek] would tell me that she could not accept the submission. She would tell me that Dan Shanahan and Jay Plum [senior management] would reprimand her if MLOs submitted time entries reflecting overtime worked." *Id.* at ¶ 23.

Hannah's declaration says that he would "re-submit [his] time entries" to show that he "only worked 80 hours in the pay period, despite the fact that [he] in fact worked more hours." *Id.* That is, he submitted inaccurate time entries because Marek blocked him from submitting accurate records. But the complaint says something a little different, alleging that Huntington altered the timecards after Hannah submitted them: "When Plaintiff attempted to accurately record his hours worked in excess of 40 hours in any given workweek, Defendant altered Plaintiff's time sheets to falsely make it appear that he worked no more than 40 hours in any given workweek." *See* Cplt. ¶ 17.

Taken together, Hannah offers three variations on his theme that the timecards were inaccurate. First, Marek submitted Hannah's timecards on her own, without his approval, showing that he worked exactly 40 hours. *See* Hannah Decl., at ¶¶ 21–22 (Dckt. No. 29-3). Second, Marek rejected timesheets with overtime, which forced Hannah to resubmit them

without overtime. *Id.* at ¶ 23. Third, someone at Huntington (the complaint doesn't say who) "altered" his timesheets to remove any reference to overtime. *See* Cplt. ¶ 17.

Hannah alleges that both Marek and Gunn saw that he was working more than 80 hours per time period. *See* Hannah Decl., at ¶ 24 (Dckt. No. 29-3). They witnessed him and the other Mortgage Loan Officers working "well in excess of 40 hours in given workweeks." *Id.* They saw him in the office working long hours, and communicated with him after normal business hours. *Id.* They "reviewed timesheets [he] attempted to enter which showed [his] actual hours worked." *Id.* But Huntington did not pay Hannah or other Mortgage Loan Officers for overtime. *See* Cplt. ¶¶ 18–19.

To support his motion to certify a collective action, Hannah signed a declaration. *See generally* Hannah Decl. (Dckt. No. 29-3). He also submitted a declaration by one opt-in Plaintiff, Dylan Hoffman. *See* Hoffman Decl. (Dckt. No. 29-4). Hoffman's sworn statement is nearly identical (almost word-for-word) to Hannah's declaration. *See id.* Hoffman, like Hannah, was a Mortgage Loan Officer. *Id.* at ¶ 3. And like Hannah, Hoffman reported to Marek and worked at the Downers Grove office. *Id.* at ¶¶ 3–4.

Viewed as a whole, the record includes declarations from two Mortgage Loan Officers who worked exclusively in Illinois. *See* Dckt. Nos. 29-3, 29-4; *see also* Marek Decl., at ¶¶ 44–45 (Dckt. No. 22-1). And both worked for one particular supervisor (Anna Marek) in one particular office (Downers Grove). *See* Dckt. No. 29-3, at ¶¶ 3–4; Dckt. No. 29-4, at ¶¶ 3–4.

Hannah offers no evidence about Mortgage Loan Officers who worked outside of Illinois. During the period in question, Huntington had 469 Mortgage Loan Officers in 12 states, but Hannah offers declarations from two employees (including himself) from just one office in just one state. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 1 (Dckt. No. 44); Marek Decl., at ¶ 24

(Dckt. No. 22-1). There is no evidence in the record from anyone outside Illinois. And there is no evidence that anyone in any other state had similar experiences when it came to overtime.

## Procedural Background

There are two pending motions, one from each party. Hannah filed a motion to proceed as a collective action under 29 U.S.C. § 216(b). *See* Pl.'s Mot. for Cert. (Dckt. No. 29). Hannah basically requests conditional certification to proceed as a collective action, which would authorize notice to other potential claimants about their opportunity to opt-in. On the other side, Huntington filed a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. *See* Def.'s Mot. to Dismiss (Dckt. No. 21). The bank argues that this Court lacks personal jurisdiction over any potential claims by putative plaintiffs outside Illinois.

## Analysis

### I.    Plaintiff's Motion to Proceed as a Collective Action

The Fair Labor Standards Act ("FLSA") entitles employees to overtime pay – at a rate of 1.5 times their regular hourly rate – for each hour worked over 40 hours per week. *See* 29 U.S.C. §§ 207, 213; *see also Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012). Certain types of employees are exempt from this requirement. *See* 29 U.S.C. § 213. But there is no dispute that Huntington's Mortgage Loan Officers are non-exempt, meaning that the FLSA applies to them. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 3 (Dckt. No. 44) ("MLOs are classified as non-exempt from the FLSA's overtime requirements, and are paid one and one-half times their regular rate of pay as overtime for hours worked above 40 in a workweek."); *see also id.* at 8 ("Huntington classifies MLOs as non-exempt from overtime."). So Huntington owes overtime pay under the FLSA to Mortgage Loan Officers if they work long enough.

The FLSA authorizes employees to file suit against their employers who fail to pay overtime required by the statute. *See* 29 U.S.C. § 216(b). But individual employees do not have to go it alone. The text of the statute authorizes a collective action by "similarly situated" employees. "An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." *Id.* To join the case, other employees must expressly consent: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.*

The opt-in requirement is one way that a collective action under the FLSA is different than a class action under Rule 23. "A collective action under § 216(b) differs from a class action under Federal Rule of Civil Procedure 23 in that Rule 23 binds class members unless they opt out, whereas collective action members are bound under § 216(b) only if they opt in to the action by providing their written consent." *Franks v. MKM Oil, Inc.*, 2012 WL 3903782, at *9 (N.D. Ill. 2012); *see also Woods v. New York Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1044 (N.D. Ill. 2003). The FLSA involves opt-ins, and Rule 23 involves opt-outs.

The FLSA speaks in broad strokes, and "does not specify the details of how collective actions are to proceed, and thus, the management of these actions has been left to the discretion of the district courts." *See Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008) (citation omitted); *see also Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (noting that district courts "have discretion, in appropriate cases," to implement the statute "by

facilitating notice to potential plaintiffs"). "Neither Congress nor the Seventh Circuit has specified the procedure courts should use to decide FLSA certification and notice issues, but collective FLSA actions in this district generally proceed under a two-step process." *Nicks v. Koch Meat Co., Inc.*, 265 F. Supp. 3d 841, 848 (N.D. Ill. 2017) (quoting *Grosscup v. KPW Mgmt., Inc.*, 2017 WL 2461538, at *1 (N.D. Ill. 2017)); *see also Black v. PF Chang's China Bistro, Inc.*, 2017 WL 2080408, at *3 (N.D. Ill. 2017); *Jirak*, 566 F. Supp. 2d at 847. Most courts, including the Northern District, have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action. *See* 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1807 (3d ed. 2020); *see also Pieksma v. Bridgeview Bank Mortgage Co., LLC*, 2016 WL 7409909, at *1 (N.D. Ill. 2016); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003).

A collective action requires plaintiffs to climb two steps. The climb gets steeper from step one to step two. "Step one involves a conditional certification, and step two, a final certification. Plaintiffs' burden increases with each, directly proportional to discovery progress." *See Briggs v. PNC Fin. Servs. Grp., Inc.*, 2016 WL 1043429, at *1 (N.D. Ill. 2016).

This case is at the first step, the more lenient "conditional certification" stage. *Nicks v. Koch Meat Co., Inc.,* 265 F. Supp. 3d 841, 848 (N.D. Ill. 2017). The first step involves "conditionally certifying a class for notice purposes," to get the word out about possibly joining the case. *See Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 855 (N.D. Ill. 2013). Conditional certification is "a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 974 (7th Cir. 2011).

At step one, the Court aims to determine (1) the size of the group of employees who may be represented to authorize appropriate notice, and (2) whether the members are "similarly situated."  *See* 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1807 (3d ed. 2020).  At this stage, a "named plaintiff can show that the potential claimants are similarly situated 'by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.'"  *See Taillon v. Kohler Rental Power, Inc.*, 2003 WL 2006593, at *1 (N.D. Ill. 2003) (citations omitted).

At step one, there is a "low standard of proof."  *Bergman*, 949 F. Supp. 2d at 855.  The Court "does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant."  *Id.* at 855–56; *see also Larsen v. Clearchoice Mobility, Inc.*, 2011 WL 3047484, at *1 (N.D. Ill. 2011) ("[T]he court does not resolve factual disputes or decide substantive issues going to the merits.").

If a plaintiff surmounts step one, the next step comes "after any opt-ins have appeared and discovery has been finished."  *See Bergman*, 949 F. Supp. 2d at 856.  At step two, the Court considers final certification, and the defendant is given an opportunity to move for decertification.  *Id.*  At that point, the Court "makes a more rigorous examination of the facts" and decides whether the case should proceed as a collective action.  *Id.*

At step one, a plaintiff only needs to make a "modest factual showing" that potential claimants are similarly situated.  *See id.* at 855.  But that doesn't mean that the Court will simply rubber stamp a motion to proceed as a collective action.  That is, conditional certification is "not automatic" and is "not a mere formality."  *See P.F. Chang's*, 2017 WL 2080408, at *4; *Boyd v.*

11

*Jupiter Aluminum Corp.*, 2006 WL 1518987, at *3 (N.D. Ind. 2006); *see also Nicks*, 265 F. Supp. 3d at 849.

Even at step one, a plaintiff "must provide some evidence in the form of affidavits, declarations, deposition testimony, or other documents to support the allegations that other similarly situated employees were subjected to a common policy that violated the law." *Nicks*, 265 F. Supp. 3d at 849 (quoting *Pieksma*, 2016 WL 7409909, at *1). The evidence needs to "demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." *Nicks*, 265 F. Supp. 3d at 849 (quoting *Briggs v. PNC Fin. Servs. Grp., Inc.*, 2016 WL 1043429, at *2 (N.D. Ill. 2016)).

The first step is a step that a plaintiff must climb – it is not a moveable walkway that gently glides a plaintiff from one place to another, from the complaint to certification. It's true that a plaintiff must make only a "modest factual showing." *Nicks*, 265 F. Supp. 3d at 848. But there must be a "showing," and it must be grounded in "fact[]." *Id.* Bare allegations and unsupported conclusions do not suffice. *See Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 786 (N.D. Ill. 2007). A plaintiff must present facts showing concrete ties to other victims, meaning other "similarly situated" employees. *See* 29 U.S.C. § 216(b).

Step one serves as an important gatekeeping function (but the gate is low). If the plaintiff fails to make at least a modest factual showing that certification is warranted, "'[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'" *See Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *4

(E.D. Wis. 2008) (quoting *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)).

Here, Hannah proposes a collective action that includes all Mortgage Loan Officers who worked for Huntington National Bank and did not receive earned overtime pay:

> All loan officers who worked for Defendant at any time from three (3) years prior to the filing of this action to the entry of judgment who have not been paid overtime for all time worked in excess of 40 in any given workweek.

*See* Cplt. ¶ 23; *see also* Pl.'s Mot. for Cert., at 5 (Dckt. No. 29). Based on his personal experience, and the experience of another employee who reported to the same manager, Hannah asks this Court to authorize notice to all Mortgage Loan Officers from coast to coast.

That immodest request exceeds the scope of his modest factual showing. The simple reality is that Hannah is complaining about his experiences with one manager in one office in one state. A bad experience in Downers Grove is not enough to justify notice nationwide.

The idiosyncratic nature of the allegations jumps off the page of Hannah's declaration. He complains about the conduct of his boss. His supervisor, "Anna Marek," instructed him not to record more than 40 hours of work, regardless of how long he worked. *See* Hannah Decl., at ¶ 20 (Dckt. No. 29-3). "Anna Marek" would enter his time entries, showing that he worked no overtime. *Id.* at ¶ 21. "Anna Marek" would submit his timecards without checking with him first. *Id.* at ¶ 22. And if Hannah tried to submit overtime, "Anna" would tell him that "she could not accept the submission." *Id.* at ¶ 23. He repeatedly pointed fingers at one person, in one office, in one state. Hoffman's complaints are identical. *See* Hoffman Decl., at ¶¶ 19–22 (Dckt. No. 29-4).

Anna Marek's sphere of responsibility was limited to the Chicagoland area. In fact, it was limited to half of Chicagoland – Area South. *See* Marek Decl., at ¶ 4 (Dckt. No. 22-1). She

only works in the Downers Grove office. *Id.* at ¶ 7. She did not manage anyone outside her Area, and she had no responsibility to review the time records of anyone outside Illinois. *Id.* at ¶¶ 37–39. There is no evidence in the record that Marek's alleged misconduct affected anyone in any other state.

Hannah also failed to present evidence that anyone outside Illinois had similar experiences. Indeed, he failed to present evidence that anyone outside *his own office* had a similar experience. Apart from his own declaration, Hannah offers only one other declaration, from another employee (opt-in Plaintiff Hoffman) managed by the same supervisor (Marek). The record is completely barren about the practices outside Illinois. That is, Hannah presented no facts that anyone outside Illinois received a similar instruction, or had their timecards commandeered, altered, or manipulated. There are no concrete facts showing that Huntington encouraged its managers to behave that way. "There must be a demonstrated similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated." *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007). But here, Hannah offers nothing else.

At bottom, Hannah makes allegations about his manager. Allegations that individual supervisors violated the FLSA aren't sufficient for company-wide collective treatment. *See Meadows v. NCR Corp.*, 2020 WL 1042042, at *6 (N.D. Ill. 2020) ("'Alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan' are not appropriate for collective treatment.") (quoting *Adair*, 2008 WL 4224360, at *7).

Other District Courts have rejected sweeping requests for conditional certification when the evidence points to practices at one or two specific locations. *See, e.g., P.F. Chang's*, 2017

WL 2080408, at *10 (holding that declarations from two employees who each worked exclusively at one P.F. Chang's restaurant location justified certification at those specific restaurants, but did not warrant expanding that conditional certification to any other restaurants); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) ("[A] demonstration of Lifeway's payment practice concerning two out of fifty employees . . . does not rise to the level of a common policy or plan by Lifeway that violated the FLSA. This is not even a 'modest factual showing' of a common policy or plan, as that term has been used in other cases."); *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 788–89 (N.D. Ill. 2007) (limiting the opt-in notice to the Chicago area because the evidence was limited to Chicago territory employees); *see also Rudd v. T.L. Cannon Corp.*, 2011 WL 831446, at *9–10 (N.D.N.Y. 2011) (limiting the collective action to employees at one Applebee's location where the submitted affidavits "fall short of identifying a particular policy or practice applied by the defendants uniformly across the board at all of their locations"); *Salinas v. O'Reilly Auto., Inc.*, 2005 WL 3783598, at *6 (N.D. Tex. 2005) (denying collective action at step one, finding that the evidence submitted – including six declarations from employees at various locations – merely showed "that a handful of [defendant's] managers have committed possible FLSA violations in a variety of ways," as opposed to a "company-wide policy or practice"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (granting defendant's motion to *reject* conditional certification at step one, finding that the loan officer plaintiffs "failed to provide sufficient evidence of a nationwide illegal policy" where the evidence showed claims "based on local policies of various managers located at different sites"); *Sheffield v. Orious Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002).

Hannah's declaration does include a statement or two about Marek's boss, Adam Gunn, but it is insubstantial. The declaration includes a solitary sentence that "Anna Marek and Adam Gunn instructed me and other MLOs to not record more than 40 hours of work in any given workweek, regardless of how much time we actually worked." *See* Hannah Decl., at ¶ 20 (Dckt. No. 29-3). The declaration is short on details. Who were the "other MLOs"? Did any of them work outside Downers Grove, Illinois? The sentence links "Anna Marek and Adam Gunn" together, which suggests that the instruction was grounded in Illinois. And how would Hannah know what Gunn said to people in other states, anyway? Hannah admits he has no personal knowledge that Gunn – or any other manager – ever told other employees to under-record time. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 12 (Dckt. No. 44) (citing Hannah Dep., Ex. 2 at 105:4-15 (Dckt. No. 44-2)). Even under a lenient standard, the stand-alone sentence in the declaration is too insubstantial to justify notice nationwide.

Hannah's motion tries to push culpability up the corporate ladder. He "aver[s] that Marek and Gunn did not independently decide to deny them earned overtime pay, but did so based on directives from executives high above the corporate hierarchy; namely, Plum and Shanahan." *See* Pl.'s Mot. for Cert., at 11 (Dckt. No. 29). But the verb choice – "aver" – gives it away. Step one doesn't require hefty evidence, but it does require more than a bare allegation. When it comes to evidence, Hannah's declaration does not deliver. There is hardly any mention of those two senior managers, except a sentence saying that they would reprimand Marek if employees worked overtime. *See* Hannah Decl., at ¶ 23 (Dckt. No. 29-3). The declaration noticeably doesn't say that senior executives directed Marek (or anyone else, for that matter) to deny overtime to employees who earned it.

Hannah's motion tries to tie connections between all Mortgage Loan Officers across the country. They're subject to the same compensation structure, and have the same production goals. They all attended training in Columbus, Ohio, and used the same system to record their time. According to him, all Mortgage Loan Officers "perform the same job duties, undergo the same training, and are subject to the same compensation plan and other terms and conditions of employment." *See* Pl.'s Mot. for Cert., at 9 (Dckt. No. 29).

All of that may be true, but those facts are entirely innocuous. There's no evidence in the record that the compensation structure, in and of itself, violates the FLSA. Setting production goals doesn't violate the FLSA, either. And Hannah points to nothing from the training that violated the FLSA. There may be common threads, but they do not tie the Mortgage Loan Officers together as "victims of a common policy or plan that violated the FLSA." *See Hudson v. Protech Sec. Group, Inc.*, 237 F. Supp. 3d 797, 799 (N.D. Ill. 2017). They may have shared common ground, but there is no evidence that the common ground violated the FLSA.

In appropriate cases, a centralized management structure can support a finding that employees are similarly situated. But when a plaintiff relies on centralized control, there is often a "specific link between the centralized control and the invalid policy, such as evidence of corporate trainers stating that performing 'side work' is the corporate policy or declarations by managers about the illegal corporate policy. Many include declarations from employees who worked at several locations and observed the same alleged violations at more than one location." *Black v. P.F. Chang's China Bistro, Inc.*, 2017 WL 2080408, at *10 (N.D. Ill. 2017) (emphasis added).

Not so here. Hannah offers no evidence outside Downers Grove. He doesn't offer facts showing that any centralized policy or practice is unlawful. He doesn't offer evidence of a

policy or practice outside his office, either. Again, Hannah admitted that he doesn't even know whether Marek or Gunn ever instructed other Mortgage Loan Officers to under-record time. *See* Def.'s Resp. to Pl.'s Mot. for Cert., at 12 (Dckt. No. 44) (citing Hannah Dep., Ex. 2 at 105:4–15 (Dckt. No. 44-2)). The record lacks testimony from employees who worked outside Downers Grove, let alone outside Illinois. Without more, Hannah lacks the requisite "identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws[.]" *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007).

The court confronted a similar location-specific claim in *Black v. P.F. Chang's China Bistro, Inc.*, 2017 WL 2080408, at *10 (N.D. Ill. 2017). Plaintiffs alleged that the restaurant maintained improper tip-sharing practices, and cited to central management and shared training. *Id.* at *1, *10. Plaintiff provided declarations from two employees – one from a restaurant in Illinois, and the other from a restaurant in New York. *Id.* at *2, *10.

The court denied the request for nationwide certification. Evidence of a centralized management structure, standing alone, was not enough to show that employees at each restaurant nationwide were subject to the same unlawful practices. *Id.* at *10. The "generalized evidence of centralized control" did not create an inference that the unlawful practices impacted *every* P.F. Chang's restaurant in Illinois and New York. The court ultimately tailored the certification to the evidence. That is, the court conditionally certified the collective action for those two P.F. Chang's restaurants, but did not expand the certification to *all* of the restaurants in Illinois and New York. *Id.* at *11.

The court in *P.F. Chang's* pointed to evidentiary gaps that exist here, too. In *P.F. Chang's*, plaintiffs didn't "describe any first-hand observations of these allegedly illegal policies

at any other restaurant." *Id.* They also didn't "submit declarations from management specific to these alleged illegal policies." *Id.* The same is true here.

Unlike the plaintiffs in *P.F. Chang's*, Hannah did offer "evidence that all managers in the states are trained by the same people and in the same location." *Id.* But centralized training doesn't advance the ball unless the centralized training has some identifiable nexus to the unlawful policy or practice. And here, Hannah offers no evidence that the training had anything to do with manipulating time records.

Hannah's evidence pales in comparison to cases in this district where plaintiffs showed that company-wide employees were "similarly situated." Those plaintiffs supported their motion with multiple declarations, spanning multiple locations. *See, e.g., Nicks*, 265 F. Supp. 3d at 852–53 ("Plaintiffs here have submitted multiple declarations from workers who worked at multiple locations in which they averred that they were regularly required to work more than 40 hours per week without being paid overtime."); *Pieksma*, 2016 WL 7409909, at *6 (finding plaintiff satisfied modest factual showing that the loan officers were subject to a common plan by "submit[ing] declarations from several LOs and managers from different offices that indicate that defendants had a policy of deducting hourly compensation and overtime pay from LOs' commissions, instructing LOs to only record forty hours of work, and failing to pay LOs for all overtime worked"); *Soto v. Wings R US Romeoville, Inc.*, 2016 WL 4701444, at *8 (N.D. Ill. 2016) (certifying collective action across four restaurants, based on six declarations from servers/bartenders that "evince[d] a consistent practice in all four franchise locations where servers and bartenders regularly perform non-tipped duties"). Other courts have allowed certification based on testimony from managers who confirmed that the disputed conduct was widespread. *See Jirak*, 566 F. Supp. 2d at 849 (evidence was sufficient to show that employees

across offices were similarly situated, in part because defendant's 30(b)(6) witness confirmed that "to his knowledge Defendant has never paid overtime to any its pharmaceutical sales representatives"). By comparison, this record is relatively barren.

Even Plaintiff's own cases don't help him. *See* Pl.'s Mot. for Cert., at 9–10 (Dckt. No. 29). He cites to Northern District of Illinois cases that allowed broad certification. But he doesn't cite a single case where the Court conditionally certified a nationwide collective action based on declarations from two people in the same office in the same state. *See Hudgins v. Total Quality Logistics, LLC*, 2016 WL 7426135, at *5 (N.D. Ill. 2016) (certifying company-wide certification based on declarations from twelve of defendant's locations across ten states, finding that the evidence gives rise to a reasonable inference that the practice is "not limited to a select few offices" and "does not vary by office location"); *Rottman v. Old Second Bancorp, Inc*., 735 F. Supp. 2d 988, 991 (N.D. Ill. 2010) (granting step-one certification where plaintiff's "modest factual showing" included evidence that the defendant had misclassified its loan originators as exempt from the FLSA's overtime requirements, and thus failed to pay them overtime when they worked more than 40 hours a week); *Betancourt v. Maxim Healthcare Services, Inc.*, 2011 WL 1548964, at *1, *6 (N.D. Ill. 2011) (conditionally certifying company-wide collective of recruiters based, in part, on claims by fourteen opt-in plaintiffs that collectively worked in at least 13 states and numerous field offices; five plaintiffs' declarations; and declarations from current employees that indicate that many recruiters "work more than 40 hours per week without overtime pay").

Even so, Hannah has offered enough evidence to support conditional certification for Mortgage Loan Officers who reported to Anna Marek in the Downers Grove office. The evidentiary record is thin, but Hannah did offer evidence that Marek prevented him from getting

20

overtime during a six-month period. Hoffman, the opt-in Plaintiff, told the identical story, even though he reported to Marek for only two months. *See* Hoffman Decl., at ¶ 4 (Dckt. No. 29-4); Marek Decl., at ¶ 6 (Dckt. No. 22-1). Hannah offered evidence that Marek unlawfully denied overtime to two employees, so it's not much of a stretch to think that she may have denied overtime to other employees, too. At the very least, there is enough evidence to explore that issue after issuing notice.

Huntington presents evidence from several satisfied Mortgage Loan Officers, all of whom say that the company never denied them overtime. *See* Gehrke Decl. (Dckt. No. 44-2, at 37 of 64); Mitter Decl. (Dckt. No. 44-2, at 44 of 64); Yelovich Decl. (Dckt. No. 44-2, at 50 of 64); Hosari Decl. (Dckt. No. 44-2, at 56 of 64). In fact, Huntington presents evidence that it paid 21 Mortgage Loan Officers more than $70,000 for more than 1,200 hours of overtime during the period in question. *See* Lint Decl., at ¶ 10 (Dckt. No. 44-2, at 63 of 64).

That may be true, but it is not a reason to deny conditional certification. Step one is not the time to weigh the evidence on both sides, or explore the merits of the case. "At the preliminary certification stage, the Court does not 'specifically consider opposing evidence presented by a defendant.'" *See P.F. Chang's*, 2017 WL 2080408, at *6 (quoting *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 855–56 (N.D. Ill. 2013)); *Nicks*, 265 F. Supp. 3d at 849 (noting that the court does not "make merits determinations" or "weigh evidence" at step one). And in any event, Huntington offers facts about what took place in Illinois, including Area North (where Marek didn't work) and Area South (both before and during Marek's tenure). Paying overtime to employees in Area North does not disprove what happened to employees in Area South.

21

The last remaining issue is the notice to the potential claimants. The Court directs the parties to confer and submit an agreed form of notice by June 5, 2020. Among other things, the notice should cover: (1) the length of the opt-in period; (2) the content of the notice; and (3) the method of notice (*e.g.,* U.S. Mail, postings, and so on).

## II.     Huntington's Motion to Dismiss

Huntington also filed a motion to dismiss, arguing that this Court lacks personal jurisdiction over any claims brought by non-Illinois plaintiffs. This Court's conditional certification is limited to employees in Illinois (actually, to one office in Illinois). As a result, Huntington's motion to dismiss is denied as moot.

### Conclusion

Plaintiff's motion for conditional certification [29] is granted in part and denied in part. Defendant's motion to dismiss [21] is denied as moot.

Date:   May 21, 2020

_____

Steven C. Seeger
United States District Judge